UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

7.31968106 BITCOIN; and

7.31967705 BITCOIN CASH;

Defendants-*in-rem*.

**VERIFIED COMPLAINT FOR FORFEITURE**

26 Civ. 9136

Plaintiff United States of America, by its attorney, James M. McDonald, United States Attorney for the Southern District of New York, for its verified complaint alleges, upon information and belief, as follows:

## I. JURISDICTION AND VENUE

1. The United States of America brings this civil action *in rem* under Title 18, United States Code, Sections 981 and 982, and Title 21, United States Code, Sections 881 and 853, seeking the forfeiture of the following digital assets:

a. 7.31968106 Bitcoin ("BTC") formerly on deposit in Kraken Account No. AA02 N84G 3KDK NQQY (the "Subject Kraken Account"); and

b. 7.31967705 Bitcoin Cash ("BCH") formerly on deposit in the Subject Kraken Account

(together, the "Defendants-*in-rem*").

2. As described below, the Defendants-*in-rem* are traceable to illegal drug sales on the online marketplace Silk Road, and property involved in the laundering of those criminal proceeds.

3. This Court has jurisdiction pursuant to Title 28, United States Code, Sections 1345 and 1355.

4. Venue is proper under Title 28, United States Code, Section 1355(b)(1)(A) because acts and omissions giving rise to forfeiture took place in the Southern District of New York.

5. The Defendants-*in-rem* are presently in the custody of the United States Department of Homeland Security, Homeland Security Investigations ("HSI").

## II. **BACKGROUND**

### A. Silk Road

6. Silk Road was an online black market, in operation from approximately 2011 to 2013. Silk Road was used by drug dealers and other unlawful vendors to distribute illegal drugs and other illicit goods and services. Silk Road was also a means for laundering the proceeds of narcotics distribution and the sale of other illicit goods and services.

7. Silk Road was designed to facilitate anonymous illegal transactions beyond the reach of law enforcement. One mechanism the site used to accomplish this involved operating on the "dark web," a term commonly referring to the collection of websites that are accessible only through anonymizing networks overlaid on top of the internet. Such networks include The Onion Router ("Tor"), the Invisible Internet Project ("I2P"), and others. These networks generally obscure both the content of traffic passing through them and the routing information for that traffic, making it difficult to trace any given user's IP address or identify the physical location of any website.

8. Silk Road specifically operated on the Tor network, the most widely used of these anonymizing systems. Websites operating on the Tor network are commonly referred to as

"hidden services" and are accessed using URLs that end in ".onion." Accessing a hidden service typically requires a web browser called the "Tor Browser" or similar Tor-enabled software.

9. Silk Road's most common offerings were illegal drugs, which were openly advertised on the site as such, and were immediately and prominently visible on the site's home page. At any given time, multi-kilogram quantities of heroin, cocaine, and methamphetamine, as well as distribution quantities of other controlled substances such as LSD, were offered on the site.

10. In addition to narcotics, other illicit goods and services were openly sold on Silk Road, including illegal computer hacking services, malicious software (such as password-stealing programs), forged identity documents, stolen financial and identity information, and murder-for-hire or "hitman" services.

11. Silk Road retained certain information regarding its users. For example, as to vendor profiles, Silk Road retained data as to which items they offered for sale, and the total sales of those items (completed, cancelled, or otherwise).

12. Silk Road's "forum," a site-wide message board, contained extensive guidance on how to evade law enforcement. It included, for instance, numerous posts by users offering advice to other users on how they should configure their computers to avoid leaving any forensic trace of their use of Silk Road.

13. The only form of payment accepted on Silk Road was bitcoin.

14. Silk Road operated as an "escrow marketplace," where user funds were treated similarly to funds in a bank account. When users wished to add funds, the market provided a bitcoin "deposit address," similar to a bank account number. The market, which controlled this deposit address, received any funds sent to it and provided a corresponding credit to the user's escrow account.

15. Once funds had been credited to a user's account, that user could purchase products from vendors operating on the Silk Road market. Upon completion of such a purchase, the market debited the order value from the user's account and credited the value to the vendor's account. Similar to intra-bank transactions, the ordering process required adjusting the balances recorded for the user's account and vendor's account; no bitcoin was actually transferred across the bitcoin network.

16. Conversely, users wishing to withdraw funds provided a bitcoin "withdrawal address" to the market. The market would send the requested funds from its "cryptocurrency wallet" to that address and debit a corresponding amount from the user's Silk Road escrow account. These funds would leave the Silk Road escrow account and transit the bitcoin network.

17. Silk Road charged a commission for every purchase conducted by its users. The commission rate varied from approximately eight to 15 percent per transaction.

18. While the site was operational, Silk Road vendors agreed to ship, and did ship, controlled substances to customers in the Southern District of New York.

B. Mt. Gox

19. Mt. Gox was a bitcoin exchange platform based in Tokyo, Japan that was launched in or about 2010.

20. Mt. Gox enabled its customers, for a fee, to exchange fiat currency, including United States dollars, for bitcoin. Customers could deposit, store, and withdraw their bitcoin and fiat currency over the internet through the Mt. Gox website.

21. In or about February 2014, Mt. Gox shut down and entered liquidation proceedings in Japan. The sudden shutdown caused Mt. Gox's estimated 750,000 customers to lose access to their accounts, preventing them from withdrawing their bitcoin from the exchange.

22. In or about 2018, the Japanese court overseeing the Mt. Gox liquidation appointed a Japanese attorney as Mt. Gox's Rehabilitation Trustee.[1] In or about 2021, a plan was approved wherein billions of dollars of bitcoin would be paid to satisfy approved claims. Creditors with approved claims were contacted by the Rehabilitation Trustee to verify their account information, and were ultimately informed that they may be eligible to receive a percentage of the funds they had previously held on the Mt. Gox platform at the time of liquidation in satisfaction of their bankruptcy claims.

23. The Mt. Gox Rehabilitation Trustee selected U.S.-based cryptocurrency exchange Kraken, among other exchanges, to receive distributions by the Trustee to Mt. Gox's creditors. The Mt. Gox Rehabilitation Trustee then transferred bitcoin and a cryptocurrency called bitcoin cash to Kraken in satisfaction of multiple Mt. Gox creditors' claims.

## III. **THE DEFENDANTS-*IN-REM***

24. Among Silk Road's users was "SuperHighFly." SuperHighFly sold multiple controlled substances on the Silk Road platform, including tetrahydrocannabinol ("THC"), to, among others, United States customers, in exchange for bitcoin. THC is a controlled substance under the federal Controlled Substances Act.

25. On or about January 17, 2013, a particular individual ("Individual-1") opened an account at Mt. Gox (the "Individual-1 Mt. Gox Account"). As a part of Mt. Gox's account opening process, Individual-1 provided Individual-1's legal name and date of birth.

26. Starting in or around January 17, 2013, bitcoin from SuperHighFly's Silk Road

---

[1] A "Rehabilitation Trustee" is similar to a Chapter 11 or Chapter 7 Trustee in a federal bankruptcy proceeding, insofar as they help administer the estate and make payments to creditors.

account (the "SuperHighFly Silk Road Account") was transferred to the Individual-1 Mt. Gox Account. Of the approximately 467.943 BTC deposited into the Individual-1 Mt. Gox Account from all sources, approximately 456.75 BTC, or 97.6%, arrived directly from the SuperHighFly Silk Road Account. These transfers included the following, in substance and in part:

a. On or about September 15, 2013, 75 BTC were transferred from the SuperHighFly Silk Road Account to the Individual-1 Mt. Gox Account; and

b. On or about September 19, 2013, 94 BTC were transferred from the SuperHighFly Silk Road Account to the Individual-1 Mt. Gox Account.

27. At no time after the above-referenced transfers did the total balance in the Individual-1 Mt. Gox Account fall below the amount of the Defendants-*in-rem*. In or about February 2014, Mt. Gox declared bankruptcy and froze its customers' accounts.

28. In connection with the Mt. Gox bankruptcy, Individual-1 designated the Subject Kraken Account to receive funds from the Mt. Gox Trustee. To open the Subject Kraken Account, Individual-1 had submitted Individual-1's name and date of birth, matching the information Individual-1 provided to Mt. Gox to open the Individual-1 Mt. Gox Account.

29. Individual-1 submitted a claim to Mt. Gox's Rehabilitation Trustee, and in connection with the resolution of bankruptcy claims, on or about March 25, 2025, the Mt. Gox Rehabilitation Trustee transferred funds, including the Defendants-*in-rem*, to Kraken, which thereafter credited the Subject Kraken Account for the amount of the Defendants-*in-rem*.[2]

---

[2] The Defendants-*in-rem* total approximately 7.31968106 BTC and 7.31967705 BCH, representing the funds ultimately seized by the Government in connection with the March 25, 2025 seizure warrant identified below. These amounts exclude transaction fees charged as the funds were transferred from the Mt. Gox Rehabilitation Trustee's wallet, to Kraken's wallet, and then to HSI's wallet. Further, the Bitcoin Cash transferred to Individual-1 resulted from that cryptocurrency's creation in 2017. On August 1, 2017, Bitcoin Cash launched as a separate

30. On or about March 25, 2025, the Honorable Magistrate Judge Valerie Figueredo for the Southern District of New York, issued a warrant authorizing the seizure of the Defendants-*in-rem*. Thereafter, pursuant to the warrant, Kraken transferred the Defendants-*in-rem* to an HSI-controlled wallet.

31. Based on the foregoing, there is reason to believe that the Defendants-*in-rem* constitute proceeds of narcotics trafficking and property involved in money laundering transactions.

## IV. **FIRST CLAIM FOR FORFEITURE**

32. The allegations above are incorporated by reference.

33. Title 21, United States Code, Section 881(a)(6) subjects to forfeiture all "moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of [Subchapter I of Title 21], all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of [Subchapter I of Title 21]."

34. Based on the foregoing, the Defendants-*in-rem* are subject to forfeiture under Title 21, United States Code, Section 881(a)(6) on the grounds that the Defendants-*in-rem*

---

network, using a modified version of bitcoin's open-source code. The new network adopted the bitcoin blockchain's existing transaction history as its own starting point, then operated as an independent network from August 1, 2017 forward. Because the new network began from a copy of bitcoin's then-current ledger, every address held a balance of Bitcoin Cash numerically equal to the balance of bitcoin it held at that address at the time of the split. That is, each bitcoin holder was given one Bitcoin Cash for each bitcoin held. Accordingly, any Bitcoin Cash derived from the Silk Road user SuperHighFly's narcotics sales that remained in Individual-1's holdings at Mt. Gox at the time Mt. Gox declared bankruptcy and froze its customers' accounts also constitutes proceeds from the sale of narcotics and property involved in money laundering.

constitute moneys furnished or intended to be furnished by any person in exchange for a controlled substance and proceeds traceable to such an exchange, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

## V. **SECOND CLAIM FOR FORFEITURE**

35. The allegations above are incorporated by reference.

36. Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property."

37. Title 18, United States Code, Section 1956(a)(1)(B)(i) imposes criminal penalties on any person who:

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . .
>
> knowing that the transaction is designed in whole or in part (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]

38. Under Title 18, United States Code, 1956(c)(7)(A), "specified unlawful activity," includes, among other things, "any act or activity constituting an offense listed in section 1961(1) of this title." Title 18, United States Code, Section 1961(1) lists as an offense "racketeering activity," which includes, among other things, "any act ... dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year."

39. Under Title 18, United States Code, Section 1956(c)(7)(B)(i), "specified unlawful activity," also includes, among other things, "an offense against a foreign nation," where

the financial transaction at issue "occurr[ed] in whole or in part in the United States" and the offense "involve[ed]…the…sale…or distribution of a controlled substance (as such term is defined for the purposes of the Controlled Substances Act)."

40. Based on the foregoing, the Defendants-*in-rem* are subject to forfeiture under Title 18, United States Code, Section 981(a)(1)(A), on the grounds that the Defendants-*in-rem* constitute property involved in money laundering transactions of narcotics proceeds in violation of Title 18, United States Code, Section 1956, and property traceable to such property.

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendants-*in-rem* and that all persons having an interest in the Defendants-*in-rem* be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendants-*in-rem* to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: New York, New York
October 16, 2026

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
Attorney for the Plaintiff
United States of America

By: ______/s/__________________________
T. Josiah Pertz
Assistant United States Attorney
26 Federal Plaza
New York, New York 10278

VERIFICATION

STATE OF NEW YORK )
COUNTY OF NEW YORK :
SOUTHERN DISTRICT OF NEW YORK )

KYLER HARDIN, pursuant to Title 28, United States Code, Section 1746, hereby declares under penalty of perjury that he is a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI"); that he has read the foregoing Verified Complaint and knows the contents thereof; that the same is true to the best of his knowledge, information and belief; and that the sources of his information and the grounds of his belief are his personal involvement in the investigation, and conversations with and documents prepared by law enforcement officers and others.

I declare under penalty of perjury that I am within the United States, and the foregoing is true and correct.

Executed on October 16, 2026

KYLER M HARDIN
Signed by: KYLER M HARDIN
Date: 2026-10-16 17:21:40 EDT

Kyler Hardin
Special Agent
Homeland Security Investigations